UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re

MARY VERONICA SANTIAGO-MONTEVERDE,

                          Debtor.
------------------------------------------------------------x

MARY VERONICA SANTIAGO-MONTEVERDE,

                          Appellant,

          -against-

JOHN S. PEREIRA,

                          Appellee.
------------------------------------------------------------x

14-cv-1611 (PKC)

Chapter 7 Case No.
11-15494 (REG)

MEMORANDUM
AND ORDER

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/27/14

CASTEL, District Judge:

          Mary Veronica Santiago-Monteverde, the debtor in this Chapter 7 bankruptcy

case, appeals from two orders of the United States Bankruptcy Court for the Southern District of

New York entered on January 15, 2014.  The first order denied the debtor's motion to convert

her bankruptcy case from Chapter 7 to Chapter 13 of the Bankruptcy Code.  The second order

approved the assumption, assignment, and sale of the debtor's rent-stabilized lease.  The

bankruptcy court issued the orders following a bench ruling rendered on January 9, 2014.  For

the reasons set forth below, the first order is vacated, the proceedings are remanded to the

bankruptcy court, and consideration of the second order is stayed pending resolution of the issues

on remand.

I. Background

    A. The Debtor's Rent-Stabilized Lease and Claimed Exemption

Santiago-Monteverde is an elderly widow residing in a rent-stabilized apartment unit in the Alphabet City neighborhood of Manhattan. She lives alone, though her son Hector Santiago lives in a rent-stabilized apartment in the same building. On November 11, 2011, Santiago-Monteverde filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. (In re Santiago-Monteverde, No. 11-15494 (RG) (Bankr. S.D.N.Y.), Dkt. No. 1)[1] John S. Pereira (the "Trustee") was appointed as trustee of the debtor's bankruptcy estate. The Trustee initially filed a no-asset report, but withdrew the report on January 13, 2012 after receiving an offer from the debtor's landlord, East 7th Street Development Corp. (the "Landlord"), to purchase the debtor's rent-stabilized lease. (Dkt. No. 6)

On February 14, 2012, the debtor's current counsel, Kathleen Cully, joined the case, substituting for prior counsel. (Dkt. No. 12) One week later, the debtor amended the schedules to her bankruptcy petition, recharacterizing her lease as personal property, electing to apply New York State exemptions pursuant to 11 U.S.C. § 522(b)(3), and claiming an exemption for the lease under section 282(2) of the New York Debtor and Creditor Law. (Dkt. No. 14) The Trustee filed an application to strike the claimed exemption as impermissible under New York law.

The bankruptcy court granted the Trustee's motion on April 10, 2014, holding that the debtor's interest in her rent-stabilized lease was not a "local public assistance benefit" under New York law and thus did not qualify for the claimed exemption. In re Santiago-Monteverde, 466 B.R. 621 (Bankr. S.D.N.Y. 2012) ("Santiago-Monteverde I"). This Court

---

[1] Unless otherwise indicated, docket numbers cited in this Memorandum and Order refer to the docket of the case before the bankruptcy court.

affirmed the bankruptcy court's decision.  In re Santiago-Monteverde, 2012 WL 3966335, 12-cv-4238 (PKC) (S.D.N.Y. Sep. 10, 2012) ("Santiago-Monteverde II").  The debtor appealed to the Second Circuit, and, after briefing and argument, on March 31, 2014 that Court certified to the New York Court of Appeals the question of whether a rent-stabilized lease is a property interest that may be exempted from a bankruptcy estate pursuant to New York State Debtor and Creditor Law section 282(2) as a "local public assistance benefit."  In re Santiago-Monteverde, 747 F.3d 153, 159 (2d Cir. 2014) ("Santiago-Monteverde III"), certified question accepted, __ N.E. 3d __, 2014 WL 1883894 (N.Y. May 13, 2014).  The case remains pending before the New York Court of Appeals.

### B.  Subsequent Motions Before the Bankruptcy Court

After the decision in Santiago-Monteverde I, the parties filed three motions in the bankruptcy court.  First, on April 24, 2012, simultaneous with filing a Notice of Appeal in this Court, the debtor filed a motion to dismiss her Chapter 7 case.[2]  Second, the Trustee moved for the approval of its assumption, assignment, and sale of the debtor's lease on August 1, 2012 (the "AAS Motion").  Third, on October 12, 2012, the debtor moved in bankruptcy court to convert her Chapter 7 case to a case under Chapter 13 of the Bankruptcy Code (the "Conversion Motion").

The debtor moved for a stay pending appeal of the bankruptcy court's decision in Santiago-Monteverde I on October 24, 2013, over eighteen months after the order was entered. Two weeks later, the debtor also moved for such a stay in the Court of Appeals for the Second

---

[2] This motion was not resolved in connection with the two orders before this Court and is not before the Court on this appeal.

Circuit.  Coincidentally, both requests were denied on November 12, 2013.  (Dkt. No. 118 at 50:18-53:13)

Between May 30, 2012 and January 9, 2014, the bankruptcy court held ten hearings in connection with the three pending motions.  In the course of these hearings, testimony was taken from parties in interest and other witnesses, including the debtor, her son, Hector Santiago; Michael Anderson, the president of the co-op board of the debtor's apartment building; James Guarino, the manager of the Landlord; and Kathleen Cully, the debtor's counsel.

C.  The Bankruptcy Court's Bench Ruling

On January 9, 2014, the bankruptcy court issued a bench ruling denying the Conversion Motion and granting the AAS Motion.   (Dkt. No. 125)  The bankruptcy court concluded that "the Debtor filed her motion to convert to Chapter 13 for the evident purpose of frustrating the proposed sale of non-exempt Estate property to the Landlord."  (Id. at 5:5-9)  The court noted that this proposed sale would result in the immediate payment in full of the approximately $23,000 in unsecured claims against the estate as well as the estate's capped administrative expense liabilities of $125,000.  (Id. at 5:10-21)

The bankruptcy court relied upon the Supreme Court's decision in Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365 (2007), which held that bad faith on the part of the debtor seeking to convert from Chapter 7 to Chapter 13 was a permissible ground for the denial of a conversion motion.  The bankruptcy court denied the Conversion Motion, but did not expressly find bad faith.  Rather, it based its ruling on "a combination of factors."  (Dkt. No. 125 at 8:24-9:2)  These factors included, inter alia, findings that the Conversion Motion was made for purposes of obstruction, that conversion would not be in the best interests of creditors, the

debtor, or the debtor's son; and that a Chapter 13 Plan would likely be futile under the confirmation standards of 11 U.S.C. section 1325. (Id. at 7:13-8:13, 9:6-9).  Based on these considerations, the bankruptcy court came "to the exceptional determination that the request for conversion here was made solely for tactical reasons, and for the express purpose to thwart the otherwise appropriate request to sell Estate property."  (Id. at 8:13-17)

The bankruptcy court also denied conversion on the alternate ground that the debtor lacked the income required to qualify as a Chapter 13 debtor under section 109(e) of the Bankruptcy Code.  Discussing the statutory requirement that a Chapter 13 debtor must be "an individual with regular income," the bankruptcy court found that both the debtor and her son lacked "the disposable income to credibly support a Plan . . . ."  (Id. at 10:1-5)

The bankruptcy court subsequently issued two orders implementing the decision. Dkt. No. 121 (the "Conversion Order") and 122 (the "AAS Order").  The debtor sought and obtained a stay of these orders pending the resolution of the appeal of Santiago-Monteverde II. (In re Santiago-Monteverde, No. 12-4131 (2d Cir. Jan 28, 2014), Dkt. No. 138)

II.   Standard of Review

This Court reviews a bankruptcy court's conclusions of law de novo and its factual findings for clear error.  In re Bennett Funding Grp., 146 F.3d 136, 138 (2d Cir.1998); see also Rule 8013, Fed. R. Bankr. P.  On appeal, the court "may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand with instructions for further proceedings."  Fed. R. Bankr. P. 8013.

III.   Discussion

    A.   <u>Chapter 7 Debtors' Qualified Right to Conversion</u>

Chapters 7 and 13 of the Bankruptcy Code provide alternative means of relief for individual debtors.  In a Chapter 7 bankruptcy case, the trustee marshals and liquidates the debtor's non-exempt assets, using the proceeds to repay creditors; in return, the debtor receives a broad discharge from his or her debts.  In a Chapter 13 case, the debtor undertakes a court-approved payment plan to repay his or her creditors over a set period of time, typically between three to five years.  The debtor receives a discharge upon successful completion of the payment plan.  In such a case, the trustee's powers are more limited and the debtor is able to retain his or her non-exempt personal property provided the obligations under the payment plan are satisfied. A party in interest may move to convert a Chapter 13 case to a Chapter 7 case if any of a number of adverse circumstances arises, such as the failure of the debtor to make timely payments under a plan.  11 U.S.C. § 1307(c).

A debtor in a Chapter 7 case has a qualified right to convert his or her case to one under Chapter 13 based on Section 706 of the Bankruptcy Code.[3]  Section 706 sets forth two limitations on this right.  First, a debtor may not convert if his or her case has previously been converted under the conversion provisions of Chapters 11, 12, or 13.  11 U.S.C. § 706(a). Second, a case may not be converted unless the debtor qualifies to be a debtor under the chapter to which conversion is sought.  11 U.S.C. § 706(d).  Section 109(e) of the Bankruptcy Code provides that "[o]nly an individual with regular income" that owes less than a certain maximum

---

[3] Section 706 provides in relevant part:
    (a) The debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title.
    (d) Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter.
11 U.S.C. § 706.

amount of debt may be a debtor in a Chapter 13 case.[4]  "Individual with regular income" is a defined term in the Bankruptcy Code.  11 U.S.C. § 101(30).

In addition to these statutory eligibility requirements, the Supreme Court has recognized a third eligibility requirement: if a debtor's Chapter 13 case would be subject to dismissal or conversion by the bankruptcy court pursuant to section 1307(c) of the Bankruptcy Code, then a debtor's right to convert may be forfeited.  Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365, 373-74 (2007).  Section 1307(c) provides that a court may dismiss or convert a Chapter 13 proceeding to Chapter 7 "for cause," and one such cause recognized by bankruptcy courts is "bad faith" on the debtor's part.  11 U.S.C. § 1307(c); Marrama at 373.  The Supreme Court concluded that a Chapter 7 debtor who has proceeded in "bad faith" and seeks conversion of his or her case to Chapter 13 is not eligible to be a debtor under Chapter 13.

In this case, the bankruptcy court cited two alternate but overlapping grounds for denying the Conversion Motion.  First, citing the Chapter 13 eligibility requirements from section 109(e), the bankruptcy court stated that neither the debtor nor her son, the proponent of the proposed Chapter 13 plan, had adequate income to support a credible Chapter 13 plan.  (Dkt. No. 125 at 10:1-5)  Second, applying Marrama, the bankruptcy court cited "exceptional" circumstances and determined that the debtor's request for conversion was made "solely for tactical reasons, and for the express purpose to thwart the otherwise appropriate request to sell Estate property."  (Id. at 8:13-17)

---

[4] The current maximum levels of indebtedness are noncontingent, liquidated, unsecured debts of less than $383,175 and noncontingent, liquidated, secured debts of less than $1,149,525.  11 U.S.C.A. § 109(e).  These amounts are calculated on the date of the filing of the petition.  Id.  The amounts in this section are periodically adjusted for inflation.  11 U.S.C. § 104.  Here, it is undisputed that the debtor's total indebtedness falls below the statutory maximums.

B.  Requirement that the Debtor be an Individual with Regular Income

In order for a Chapter 13 petitioner to qualify as a debtor, Section 109(e) requires a finding that the petitioner is an "individual with regular income," which is elsewhere defined as an "individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13 of this title . . . ."  11 U.S.C. §§ 101(30), 109(e).  With respect to the "individual with regular income" requirement, the bankruptcy court found that "while [the debtor] notionally has regular income, it is woefully inadequate to support a credible Chapter 13 Plan."  (Dkt. No. 125 at 10:1-5; see also id. at 9:20-25)  The debtor challenges the appropriateness of this finding because it focuses upon the sufficiency of the income rather than on whether it is regular and stable.

The debtor provided evidence of three potential sources of income: Social Security payments, income from service as a superintendent in her building, and contributions from her son, Hector.  The bankruptcy court did not specify which sources of income it had considered.  Two issues are, thus, implicitly raised: first, whether the debtor's proposed sources of income are properly considered in the Chapter 13 eligibility determination, and second, whether the bankruptcy court properly considered the sufficiency of the debtor's income in the eligibility determination.

1.  Sources of Income

The phrase "individual with regular income" is defined in section 101(30) of the Bankruptcy Code, and constitutes a significant alteration of the language from the analogue provision of the previous bankruptcy statute.  The Bankruptcy Act of 1898, the predecessor

statute to the modern Bankruptcy Code, had required that a prospective debtor under Chapter

XIII be a "wage earner," defined as an individual whose principal income was derived from

"wages, salary, or commissions."  See United States v. Devall, 704 F.2d 1513, 1515 (11th Cir.

1983).  The Bankruptcy Code substituted the phrase "individual with regular income" for "wage

earner," and the legislative history of the Bankruptcy Reform Act of 1978 indicates that this

modification was intended to substantially broaden the scope of individuals eligible to seek relief

under Chapter 13.  Id. at 1515-16.[5]  Based on this context, a substantial majority of courts have

concluded that the type or source of an individual's income is generally irrelevant to the issue of

eligibility so long as the income is, in the words of the statute, "stable and regular."  See, e.g., In

re Antoine, 208 B.R. 17, 19 (Bankr. E.D.N.Y. 1997) (collecting cases).

In the course of the hearings before the bankruptcy court, the debtor testified that

she had two sources of income: a $1,200 monthly Social Security check, and a $450 monthly

payment for her services as the superintendent of the apartment building.  (Oct. 22, 2013 Hr'g

Tr. at 37:3-19, Dkt. No. 110)  In addition, her son testified that he worked as a personal trainer

and would be able to contribute up to $500 per month towards the funding of his mother's

Chapter 13 plan.  (Nov. 12, 2013 Hr'g Tr. at 65:9-25, Dkt. No. 118)

2.  Social Security Income in Chapter 13 Eligibility Determinations

Despite the broad range of sources of income considered in determining Chapter

13 eligibility, courts are divided on whether Social Security benefits may properly be considered.

---

[5] The Senate Report for the Bankruptcy Reform Act of 1978 states that the purpose of the modification was to "permit almost any individual with regular income to propose and to have approved a reasonable plan for debt repayment based on that individual's exact circumstances."  S. Rep. No. 95–989, at 13, 1978 U.S. Code Cong. & Ad. News at 5799.  The House Report further stated that "[e]ven individuals whose primary income is from investments, pensions, social security or welfare may use chapter 13 if their income is sufficiently stable and regular."  H. Rep. No. 95–595, 95th Cong., 1st Sess. 119, reprinted in 1978 U.S. Code Cong. & Ad. News 5963, 6080.

Section 207 of the Social Security Act, enacted in 1935, provides that "none of the moneys paid or payable or rights existing under this subchapter shall be subject to . . . the operation of any bankruptcy or insolvency law."  42 U.S.C. § 407(a).  Shortly after the passage of the Bankruptcy Code in 1978, several courts held that the Code had impliedly partially repealed section 207.  Devall, 704 F.2d at 1518-19 ("We therefore find that the Bankruptcy Code must be construed to limit the anti-assignment provision of the Social Security Act when the debtor voluntarily submits a Chapter 13 plan."); In re Penland, 11 B.R. 522, 523-24 (Bankr. E.D. Tenn. 1980) ("[T]he Court finds that construing the Bankruptcy Code to have repealed or amended the Social Security Act in this limited fashion is in accordance with the intentions of the drafters of both statutes."); In re Buren, 6 B.R. 744, 748 (M.D. Tenn. 1980) rev'd, 725 F.2d 1080 (6th Cir. 1984) ("Therefore, the Court holds that notwithstanding the language of 42 U.S.C. s 407, social security benefits are subject to the operation of the bankruptcy laws only insofar as the debtor is allowed voluntarily to include the benefits as property of the estate and the bankruptcy proceeding, such as a Chapter 13 proceeding, can be entered into only by the voluntary action of the debtor.").  Each of these courts emphasized that the implied repeal retained existing protections against involuntary seizures and only permitted debtors to voluntarily commit their Social Security income to fund a Chapter 13 plan.  See Devall, 704 F.2d at 1518 (reaching its conclusion based in part on "Congress's intention . . . manifested in its expansion of the class of individuals eligible to invoke Chapter 13 to include social security recipients.").

        In 1983, in response to this line of cases, Congress amended section 207, adding a subsection providing that no provision of law could be construed to limit, supersede, or otherwise modify that section unless such a provision does so expressly.  42 U.S.C. § 407(b) ("No other provision of law, enacted before, on, or after April 20, 1983, may be construed to

limit, supersede, or otherwise modify the provisions of this section except to the extent that it does so by express reference to this section."); see In re Buren, 725 F.2d at 1087; H.R. Conf. Rep. 98-47, 153, 1983 U.S.C.C.A.N. 404, 443 (1983) ("Based on the legislative history of the Bankruptcy Reform Act of 1978, some bankruptcy courts have considered social security and SSI benefits listed by the debtor to be income for purposes of a Chapter XIII [sic] bankruptcy and have ordered SSA in several hundred cases to send all or a part of a debtor's benefit check to the trustee in bankruptcy.").

Because Social Security benefits are therefore not subject to bankruptcy law, courts have disagreed on whether it is proper to consider them as part of the debtor's regular income in the context of the Chapter 13 eligibility determination.  See, e.g., In re Baxter, 34 B.R. 911, 913 (Bankr. Tenn. 1983) ("[T]he 'regular income' that makes a debtor eligible for Chapter 13 must be part of the bankruptcy estate and subject to the court's and the trustee's control."); but see In re Buren, 725 F.2d 1080, 1086 (6th Cir. 1984); In re Howell, 138 B.R. 484, 488 (W.D. Pa. 1992) (quoting 5 Collier on Bankruptcy ¶ 1300.12[24]).

Based on the plain language of section 207 of the Social Security Act, this Court holds that Social Security income may not be considered in a Chapter 13 eligibility determination.  The statute provides that Social Security income shall not be subject to "the operation of any bankruptcy or insolvency law."  42 U.S.C. § 407(a) (emphasis added).  This categorical exemption excludes Social Security income from the operation of all bankruptcy or insolvency laws, regardless of whether they may be beneficial or detrimental to the Social Security recipient.

In amending the law in 1983, Congress could have drafted a statute that, for instance, prevented creditors from attaching or bankruptcy courts from ordering the turnover of

Social Security income or rights thereto, but Congress instead retained the statute's far broader

formulation.  Indeed, Devall, one of the cases that prompted the 1983 amendment, found an

implied partial repeal based on Congress's previously demonstrated desire to expand Chapter 13

eligibility to include Social Security recipients, and further provided that "Social security

benefits remain insulated from creditor claims and attachments except to the extent that the

recipient voluntarily submits them to Chapter 13 trustee."  704 F.2d at 1518-19.  That Congress

enacted the amendment to repudiate this case and other cases with similar reasoning, taken

together with the amendment's leaving unaltered section 207's sweeping language, supports this

Court's construction of the statute.

Courts that have considered Social Security income in the Chapter 13 eligibility

determination primarily rely on excerpts from the previously discussed legislative history of the

Bankruptcy Reform Act of 1978.  Specifically, the House Report provided:

> The definition [of "individual with regular income"] encompasses all individuals
> with incomes that are sufficiently stable and regular to enable them to make
> payments under a chapter 13 plan. Thus, individuals on welfare, social security,
> fixed pension incomes, or who live on investment incomes, will be able to work
> out repayment plans with their creditors rather than being forced into straight
> bankruptcy.

H.R. Rep. No. 95–595, 95th Cong., 1st Sess. at 313 (1978).  See, e.g., In re Hammonds, 729 F.2d

1391, 1393 (11th Cir. 1984); In re Hagel, 184 B.R. 793, 798 (9th Cir. B.A.P. 1994); In re Devall,

9 B.R. 41, 43 (Bankr. M.D. Ala. 1980).  But judicial reliance upon the legislative history of the

1978 enactment fails to take account of Congress's subsequent legislative action in the 1983

amendments.  In any case, "in interpreting a statute a court should always turn first to one,

cardinal canon before all others[:] . . . courts must presume that a [] legislature says in a statute

what it means and means in a statute what it says there." <u>Connecticut Nat. Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992).

The leading bankruptcy treatise posits that a debtor's voluntary commitment of fungible dollars already received as Social Security income negates the applicability of section 207 for purposes of the eligibility determination.  5 Collier on Bankruptcy ¶ 1300.12[24] ("[Disability and SSI] benefits, once received, may be voluntarily paid to the Chapter 13 trustee to comply with the terms of a proposed plan, and would become property of the estate upon such payment.  Therefore, a debtor receiving such benefits qualifies as an 'individual with regular income' eligible for Chapter 13.").

But it is income itself that may qualify an individual as a Chapter 13 debtor—not cash on hand, wealth, or funds in a bank account.  The Chapter 13 eligibility question does not ask whether the individual has fungible dollars with which to make payments under a Chapter 13 plan, but rather considers whether the individual's income is "sufficiently stable and regular" to make such payments.  11 U.S.C. § 101(30).  This cannot be assessed without consideration of the source of that income.  In this case, a proposed source is the debtor's Social Security income, which creates an unavoidable conflict between section 207 and the eligibility determination of section 109(e) of the Bankruptcy Code.[6]

---

[6] Moreover, section 207 applies to Social Security benefits even after they are distributed to beneficiaries.  42 U.S.C. § 407(a) (". . . none of the moneys <u>paid or payable</u> or rights existing under this subchapter shall be subject to . . . the operation of any bankruptcy or insolvency law.") (emphasis added); <u>see</u> <u>Philpott v. Essex Cnty. Welfare Bd.</u>, 409 U.S. 413, 414-16 (1973).  In <u>Philpott</u>, the Supreme Court rejected the state of New Jersey's attempt to attach retroactive Social Security payments deposited in a bank account, despite the beneficiary's having previously signed a reimbursement agreement in order to receive interim state benefits while his application for the federal benefits was pending.  <u>Id.</u> at 415–16.  The Court held that New Jersey's suit for reimbursement violated section 207 on its face.  <u>Id.</u>  <u>See</u> <u>also</u> <u>Heymann v. Brechner</u>, 95-cv-1329 (CSH), 1996 WL 580915, at *7 (S.D.N.Y. Oct. 9, 1996) (citing <u>Philpott</u> at 416) ("[Section 207] applies to funds subsequently deposited in a bank account and commingled with other assets.")  The present appeal does not require the Court to consider whether paid Social Security benefits may be voluntarily committed to a plan.  It suffices for present purposes that such benefits may not be considered for the threshold "regular and stable" income requirement.

Section 207 expressly excludes Social Security income from "the operation of any bankruptcy or insolvency law."  42 U.S.C. § 407(a).  Although the Social Security Act was enacted in 1935 and thus predated the Bankruptcy Code of 1978, Congress amended section 207 in 1983 in direct response to judicial decisions highlighting the conflict between this provision and the Bankruptcy Code.  In so doing, Congress reaffirmed that the wholesale inapplicability of bankruptcy or insolvency laws remained unchanged from its initial formulation.  42 U.S.C. § 407(b).[7]

Accordingly, it is improper for a bankruptcy court to consider a debtor's Social Security benefits in determining whether she is an individual with regular income within the meaning of section 101(30).  Though it is unclear whether the bankruptcy court in this case so considered the debtor's Social Security income, on remand this income should be excluded from any eligibility determination.

3.   Additional Sources of Income

Aside from her Social Security income, the debtor also testified that she received $450 per month as payment for her services as the superintendent of her apartment building. (Oct. 22, 2013 Hr'g Tr. at 37:3-19, Dkt. No. 110)  The debtor's son, Hector Santiago, later testified that his father previously worked as the superintendent, that he took over superintendent duties when his father fell ill, and that he has continued to carry out superintendent duties so that his mother would continue to receive the monthly check.  (Nov. 12 Hr'g Tr. at 71:19-72:13, Dkt. No. 118)  None of this testimony was disputed in the course of the hearings.  The bankruptcy

---

[7] It is the role of lawmakers, and not this Court, to decide whether it is desirable for Social Security recipients to utilize their benefits in developing and funding a plan under Chapter 13.  While one could view the flexibility of having such an option as beneficial to Social Security recipients, it may also be the case that, as a matter of social policy, lawmakers do not want recipients using their benefits to pay their creditors.

court made no explicit finding of fact regarding this claimed source of income: though the bankruptcy court stated that the debtor "has regular income," Dkt. No. 125 at 9:20-21, the only specific source of income referenced was the debtor's monthly Social Security check, Id. at 10:6-9.  The absence of a finding precludes meaningful review by this Court.  On remand, the bankruptcy court should make a finding of whether the purported monthly payment qualifies the debtor as an "individual with regular income," to the extent that such a determination is necessary to the disposition of the Conversion Motion.

The final source of income proffered by the debtor at trial was the proposed contribution of Hector Santiago.  Based on a rough estimate of his disposable income, Santiago initially testified that he would be willing to contribute all such income—up to $500 per month—to fund his mother's Chapter 13 plan.  (Nov. 12, 2013 Hr'g Tr. at 65:9-13, Dkt. No. 118)  On cross examination, Santiago significantly qualified his commitment, stating that "I ain't saying that I would have that $500.00 . . . I ain't saying that I wouldn't have it or I would, you know what I mean?"  (Id. at 109:8-13)  He further expressed uncertainty that he would have the necessary funds available:

> Will I be able to pay is a big question.  I would try my best to make ends meet by – if I had to pull back on certain things, make reductions of my expenses, if I had to get more work from my boss, if I ask for it, hopefully they will give it to me. Would I have to get a second job?  You know, those are all things that are off for when the time comes, Your Honor, that I can't answer right now, you know.

Id. at 109:24-110:6.

Generally, gratuitous payments by family members and other third parties have not been held to constitute "sufficiently stable and regular" income under the Bankruptcy Code. Courts have only accepted such contributions where indicia of stability or regularity are present; for instance, where the contributor shares joint liability or common property interests with the

debtor, has previously demonstrated willingness to assist the debtor, or possesses a substantial interest in the debtor's successful execution of the plan under consideration.  In re Campbell, 38 B.R. 193, 196 (Bankr. E.D.N.Y. 1984); see also In re Varian, 91 B.R. 653, 654 (Bankr. D. Conn. 1988) (citing Campbell at 196) ("While payments motivated solely by generosity may not be regular income, it has been found that where a family member dedicates income for the purposes of the plan, and is motivated by 'enlightened self-interest and a duty,' the debtor's income is sufficiently regular and stable to confirm the plan.")

The bankruptcy court did not make findings with respect to the stability and regularity of the debtor's income.  Instead, the bankruptcy court's analysis focused on whether income was likely to be adequate or sufficient to make a plan viable.  If necessary to the disposition of the Conversion Motion, on remand the bankruptcy court may consider whether Santiago's proposed contributions would make the debtor an "individual with income sufficiently regular and stable to make payments under a Chapter 13 plan."  11 U.S.C. § 101(30).

### 4.  The Bankruptcy Court's Sufficiency Requirement

In denying conversion based on the inability of the debtor and her son to fund a Chapter 13 plan, the bankruptcy court appeared to apply a sufficiency requirement—that is, to require that the debtor's income be sufficient to "credibly support" a Chapter 13 plan.  A number of courts have adopted such a requirement.  See, e.g., In re Terry, 630 F.2d 634, 635 (8th Cir. 1980) (rejecting a Chapter 13 plan that proposed to pay nothing to creditors and stating that the debtor's income must "sufficiently exceed[] his expenses so that he can maintain a payment schedule."); In re Negosh, No. 06-cv-5617 (JS), 2007 WL 2445158, at *4 (E.D.N.Y. Aug. 22, 2007) ("Thus, review of a motion to convert requires a determination as to the debtor's abilities

to make all the payments called for by the Chapter 13 plan."); In re Wilhelm, 6 B.R. 905, 908

(Bankr. E.D.N.Y. 1980) ("To apply for and to qualify for relief under Chapter 13, a debtor must

have a regular and stable income equal to the demands of his plan.").

   This Court respectfully disagrees.  The plain language of the statute imposes no

sufficiency requirement with respect to income.  The adverb "sufficiently" modifies the

adjectives "stable" and "regular," which in turn modify "income."  Further, according to the

words of the statute, the payments need only be "sufficiently stable and regular to enable such

individual to make payments under a plan under chapter 13 of this title" and need not be

adequate or sufficient to ensure full payment of a specific Chapter 13 plan.  11 U.S.C. § 101(30).

   In the context of a conversion motion, a distinction should be drawn between

determining eligibility to be debtor under the chapter to which conversion is sought and the

feasibility of the eventual confirmation of a plan under the same chapter.  The former is a basic

gatekeeping inquiry: so long a prospective debtor satisfies the few requirements of section

109(e), eligibility is established.  In contrast, the feasibility determination is conducted pursuant

to the extensive and detailed requirements set forth in section 1325 of the Bankruptcy Code, and

only after a plan has been filed.  See 11 U.S.C. § 1325.  Because a Chapter 13 plan need not be

filed until 14 days after the petition for relief, it is premature to consider the feasibility of such a

plan prior to conversion.  See Fed. R. Bankr. P. 3015(b).[8]  If a debtor seeking conversion to

Chapter 13 has income that is sufficiently regular and stable to enable him or her to make

payments under some hypothetical Chapter 13 plan, the gatekeeping definitional requirement of

101(30) is satisfied.

---

[8] As further discussed below, however, the prospective feasibility of a Chapter 13 plan is appropriately considered as one of the factors in analyzing whether the debtor's right to convert has been forfeited by bad faith conduct.

Here, the bankruptcy court found that the debtor "has regular income." (Dkt. No. 125 at 9:20-12) The bankruptcy court may also have considered the proposed contributions of the debtor's son to the debtor's Chapter 13 plan. Once it is determined that the debtor has "sufficiently regular and stable" income to make payments under a hypothetical Chapter 13 plan, the definitional requirement of section 101(30) incorporated in the eligibility requirements of section 109(e) is satisfied. The adequacy of the debtor's income to fully support a specific plan is not part of the analysis. Ultimately, the bankruptcy court's concerns about the futility of conversion in this case may well prove well-founded, but in such a circumstance the court may reconvert the case to Chapter 7 or dismiss the case altogether pursuant to section 1307(c). Cf. Marrama, 549 U.S. 365, 380-81 (Alito, J. dissenting) ("It is by no means clear, however, that conversion under § 706(a) followed by a reconversion proceeding under § 1307(c) would be an empty exercise.").

C.  Forfeiture Based on Bad Faith Conduct

In addition to its consideration of the adequacy of the debtor's income, the bankruptcy court relied upon Marrama to conclude that the debtor had forfeited her right to conversion. However, the bankruptcy court appeared to renounce reliance on a finding of bad faith, which Marrama requires.[9] (Dkt. No. 125 at 7:8-12) ("For these reasons, conversion of the case . . . would not be barred by an objective finding of lack of good faith that can be discerned from the record.") The bankruptcy court further found that the facts in Marrama "are truly distinguishable from those presented here[,]" noting that that case involved the fraudulent concealment of assets by an individual debtor and "turned on the question of that debtor's lack of

---

[9] The bankruptcy court used the phrase "lack of good faith" rather than "bad faith," the phrase used by the Supreme Court in Marrama. In this context, the Court discerns no distinction between the two phrases in this context and thus construes them as interchangeable.

good faith." (Id. at 8:18-23) Nevertheless, the bankruptcy court found that a Marrama exception

to the right of conversion applied, based in part on the "tactical nature of the request," which led

"to the conclusion that the motion to convert was made for purposes of obstruction and not for

purposes of individual reorganization and rehabilitation consistent with the provisions of Chapter

13." (Id. at 18:24-19:9)

       In Marrama, the Supreme Court declined to define "bad faith" sufficient to deny

conversion, but noted that the debtor's conduct "must, in fact, be atypical" and that "[l]imiting . .

. denial of conversion to extraordinary cases is particularly appropriate . . . ." 549 U.S. at 375

n.11. While courts generally analyze bad faith in a bankruptcy case based on the totality of the

circumstances, they have also articulated a wide range of factors to be considered in the

determination. In evaluating bad faith some courts consider:

> (i) whether the debtor is seeking to convert to chapter 13 in good faith (including
> a review of facts such as the timing of the motion to convert; the debtor's motive
> in filing the motion; and whether the debtor has been forthcoming with the
> bankruptcy court and creditors); (ii) whether the debtor can propose a confirmable
> chapter 13 plan; (iii) the impact on the debtor of denying conversion weighed
> against the prejudice to creditors caused by allowing conversion; (iv) the effect of
> conversion on the efficient administration of the bankruptcy estate; and (v)
> whether conversion would further an abuse of the bankruptcy process.

In re Pakuris, 262 B.R. 330, 335-36 (Bankr. E.D. Pa. 2001); see also In re Lilley, 91 F.3d 491,

496 (3d Cir. 1996); In re Love, 957 F.2d 1350, 1357 (7th Cir. 1992); In re Kerivan, No. 09-

14581 (AJG), 2010 WL 2472674, at *2 (Bankr. S.D.N.Y. Jun. 15, 2010).

       By stating that "conversion of the case from Chapter 7 to Chapter 13 would not be

barred by an objective finding of lack of good faith that can be discerned from the record," Dkt.

No. 125 at 7:9-12, but nonetheless holding that conversion was barred under Marrama, the

bankruptcy court erred in two ways. First, the bankruptcy court went beyond the parameters of

the bad faith forfeiture rule set forth in <u>Marrama</u>.  Second, the bankruptcy court took too narrow a view of the definition of bad faith.

The bankruptcy court described its finding that the conversion request was made solely for tactical reasons as an "exceptional determination," Dkt. No. 125 at 8:13-17, and further described the conduct of debtor's counsel as "unprecedented," "atypical," "remarkable," and "unusual," Dkt. No. 125 at 10:18-11:14.  In <u>Marrama</u>, the Supreme Court noted that "bad faith" conduct "must, in fact, be atypical," and that denial of conversion should be limited to "extraordinary cases."  549 U.S. at 375 n.11.  However, atypicality and extraordinariness in the circumstances surrounding a motion to convert are necessary but not sufficient to qualify for the forfeiture rule articulated by the Supreme Court.  Absent a finding of bad faith, <u>Marrama</u> forfeiture cannot apply no matter how atypical or extraordinary the circumstances.

The determination by the bankruptcy court that "conversion . . . would not be barred by an objective finding of lack of good faith" followed a discussion of the conduct of the debtor's counsel.  After noting that the debtor was a "credible and honest individual," the bankruptcy court explained that debtor's counsel "has acted in good faith as she sees it, but she has also engaged in professional behavior that has had the effect of unduly complicating and delaying these proceedings, thereby adding administrative burden and expense to the Estate, and imposing considerable burdens on this Court."  (Dkt. No. 125 at 6:10-7:5)  The court then stated:

> The Court finds that counsel intended to do what she believed to be in the best interests of her client.  For these reasons, conversion of the case from Chapter 7 to Chapter 13 would not be barred by an objective finding of lack of good faith that can be discerned from the record.

(<u>Id.</u> at 7:8-12)  It thus appears that the bankruptcy court's finding was premised on the notion that a client whose attorney believes herself to be acting in the best interests of her client is immunized from a finding of bad faith.  But an attorney's sincere belief that his or her actions are

taken in the best interest of a client does not, without more, immunize that conduct from a finding of bad faith.  This principle is clear from the law of sanctions under Rule 11 of the Federal Rules of Civil Procedure; disciplinary sanctions are routinely imposed on attorneys for conduct sincerely believed to be in the best interests of clients but that nonetheless runs afoul of applicable rules of professional conduct.  See, e.g., Cardona v. Mohabir, 14-cv-1596 (PKC), 2014 WL 1804793, at *4 (S.D.N.Y. May 6, 2014).  An example based on the facts of Marrama is illustrative.  In that case, the court's finding of bad faith was premised on the debtor's fraudulent concealment of assets from the trustee.  Had the debtor's attorney omitted non-exempt assets of the debtor in filing the Chapter 7 petition based on a sincere belief that concealing the assets was in the best interest of his client, the attorney's conduct—and, by attribution, the debtor's conduct—would nonetheless have been in bad faith.

Also, the conduct of an attorney is attributable to the client.  "Normally, the conduct of an attorney is imputed to his client, for allowing a party to evade 'the consequences of the acts or omissions of [ ] his freely selected agent' 'would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent.' "  S.E.C. v. McNulty, 137 F.3d 732, 739 (2d Cir. 1998) (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 633–34 (1962)).  Accordingly, the rationale that led the bankruptcy court to conclude that bad faith was not present was erroneous, and as further discussed below this determination may be revisited on remand.

### D.  Considerations on Remand

On remand, the bankruptcy court may consider each of the two eligibility requirements discussed—the income eligibility requirement and the requirement that the debtor

has not proceeded in bad faith—to the extent necessary for the disposition of the Conversion

Motion.  If the bankruptcy court concludes that there is not sufficiently regular and stable income

to make payments under a Chapter 13 plan, then it may deny conversion on that basis alone.

Similarly, if it finds that the debtor has acted in bad faith, it may deny conversion without

addressing the income eligibility requirement.

   This Court's holding that <u>Marrama</u> forfeiture cannot apply in the absence of a

finding of bad faith does not imply that bad faith may not exist in the instant case.  Despite its

finding that the record did not evince a lack of good faith sufficient to bar conversion, the

bankruptcy court did make numerous findings that might support a finding of bad faith in an

appropriate totality-of-the-circumstances analysis incorporating commonly applied factors.  <u>See</u>

<u>In re Pakuris</u>, 262 B.R. at 335-36.  Specifically, the bankruptcy court found (1) that conversion

demonstrably would not be in the best interests of creditors, Dkt. No. 125 at 7:13-16, (2) that

conversion would also not be in the best interests of the debtor or the Chapter 13 plan proponent,

her son, <u>id.</u> at 7:17-22, (3) that conversion "in all likelihood would be futile under the

confirmation standards in 11 U.S.C., section 1325," <u>id.</u>, (4) that "no experienced consumer

lawyer acting in good faith would ever advise this Debtor to file a petition under Chapter 13 in

the first instance," <u>id.</u> at 8:6-9, and (5) that conversion was sought for "purposes of obstruction

and not for purposes of individual reorganization and rehabilitation consistent with the

provisions of Chapter 13," <u>id.</u> at 8:13-17, and " "solely for tactical reasons, and for the express

purpose to thwart the otherwise appropriate request to sell Estate property."  <u>Id.</u> at 9:6-9.

   The bankruptcy court also cited as a consideration the extraordinary circumstance

of the debtor's counsel, utilizing her own personal funds, establishing an escrow account of

$125,000 for the stated purpose of covering the administrative expenses of the debtor's

bankruptcy estate.  (Dkt. No. 125 at 10:10-11:12)  Without drawing any conclusion as to whether this conduct constituted generosity or gamesmanship,[10] the bankruptcy court noted that counsel's actions constituted "a level of heroic behavior that by its very nature demonstrates that such conversion would otherwise be completely futile."  (Id. at 11:12-14)  The bankruptcy court further noted its concern that "various procedural maneuvers have taken place in [the debtor's] name, but without her full participation in the process."  (Id. at 13:2-6)  Indeed, when she was questioned as a witness debtor's counsel repeatedly admitted that she had not informed her client of her establishment of the escrow account for her benefit, or that the account would be used to fund her Chapter 13 plan.  (Nov. 12 Hr'g Tr. at 169-173)  Putting aside the ethical issues implicated, such conduct raises questions as to the motive behind the conversion request and whether conversion under the circumstances might constitute an abuse of the bankruptcy process.

The bankruptcy court held extensive evidentiary hearings on the Conversion Motion, observing live testimony from several witnesses including the debtor, her son, and her counsel.  The Court recognizes that the bankruptcy judge who presided over these proceedings is no longer sitting.  Accordingly, the Court leaves it to the sound discretion of the bankruptcy judge to whom the matter is reassigned whether to decide the motion on the record as it stands or reopen the record.  Further, the Court leaves it to the sound discretion of the bankruptcy court to decide the timing and sequence of proceedings on remand and whether they should be deferred until after the mandate issues from the Second Circuit following the resolution of the certified question before the New York Court of Appeals.

---

[10] This Court also does not pass upon whether this arrangement would violate Rule 1.4, Rule 1.8(e), or any other provision of the Rules of Professional Conduct (22 NYCRR 1200.0).

E.  Sale Order

If, on remand, the Conversion Motion is granted by the bankruptcy court, consideration of the AAS Order would become moot.  The same would hold if the New York Court of Appeals determines that the debtor's lease is exempt under New York law.  In light of these considerations, the appeal from the AAS Order is dismissed without prejudice to reinstatement within 30 days from the sooner of a ruling by the bankruptcy court on Conversion Motion or the ruling of the Second Circuit following the New York Court of Appeals's determination of the certified question regarding exemption.

CONCLUSION

For the foregoing reasons, the bankruptcy court's first order of January 15, 2014 (Dkt. No. 121) is VACATED, and the case is REMANDED to that bankruptcy court for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       June 27, 2014